## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORAH BRASH,<br><br>       Plaintiff,<br><br>  -against-<br><br>CHANGE HEALTHCARE, INC., NEIL E. DE CRESCENZO, HOWARD L. LANCE, NELLA DOMENICI, NICHOLAS L. KUHAR, DIANA MCKENZIE, BANSI NAGJI, PHILIP M. PEAD, PHILLIP W. ROE, NEIL P. SIMPKINS, and ROBERT J. ZOLLARS,<br><br>       Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Deborah Brash ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## <u>NATURE OF THE ACTION</u>

1.  This is an action brought by Plaintiff against Change Healthcare, Inc. ("Change" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Change, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor. Plaintiff's claims arise in connection with the proposed acquisition of Change by UnitedHealth Group Incorporated ("UnitedHealth") and its subsidiary, Cambridge Merger Sub, Inc. ("Merger

Sub") (the "Proposed Merger").

2.      On January 5, 2021, Change entered into an agreement and plan of merger by and among (i) the Company, (ii) UnitedHealth, and (iii) Merger Sub (the "Merger Agreement"). Pursuant to the which stockholders of Change will receive $25.75 for each share of Change common stock in consideration for their shares (the "Merger Consideration").

3.      On March 5, 2021, to convince Change's shareholders to vote for the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the SEC. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; (ii) the fairness opinion and financial analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"); and (iii) the interests of the Independent Defendants in the Proposed Merger and steps taken to isolate those interests.

4.      Disclosure of this information is critical as the transaction is expected to close in the second half of 2021, with the shareholder vote to take place shortly prior to the closing (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Merger.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Change's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the

Defendants' misconduct.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.     The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

8.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. At 1316.

9.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Change's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, and the Company hired financial and legal advisors for the purposes of the Proposed Merger, which are also located in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003)

(collecting cases).

## **PARTIES**

10.     Plaintiff Amy Balsavage is, and has been continuously throughout all times relevant hereto, the owner of Change common stock.

11.     Defendant Change Healthcare, Inc. is incorporated in Delaware and maintains its principal executive offices at 424 Church Street, Suite 1400, Nashville, Tennessee 37219. The Company's common stock trades on the Nasdaq under the ticker symbol "CHNG".

12.     Individual Defendant Neil E. De Crescenzo is, and at all relevant times has been, the Chief Executive Officer and a director for the Company.

13.     Individual Defendant Howard L. Lance is, and at all relevant times has been, the Chairman of the Board for the Company.

14.     Individual Defendant Nella Domenici is, and at all relevant times has been, a director of the Company.

15.     Individual Defendant Nicholas L. Kuhar is, and at all relevant times has been, a director of the Company.

16.     Individual Defendant Diana McKenzie is, and at all relevant times has been, a director of the Company.

17.     Individual Defendant Bansi Nagji is, and at all relevant times has been, a director of the Company.

18.     Individual Defendant Philip M. Pead is, and at all relevant times has been, a director of the Company.

19.     Individual Defendant Phillip W. Roe is, and at all relevant times has been, a director of the Company.

20.     Individual Defendant Neil P. Simpkins is, and at all relevant times has been, a director of the Company.

21.     Individual Defendant Robert J. Zollars is, and at all relevant times has been, a director of the Company.

22.     The defendants referred to in ¶¶ 12-21 are collectively referred to herein as the "Individual Defendants" or the "Board", and together with Change as the "Defendants."

### SUBSTANTIVE ALLEGATIONS

**A.  Background of the Proposed Merger**

23.     Change is a leading healthcare technology platform that provides data and analytics-driven solutions to improve clinical, financial, administrative, and patient engagement outcomes in the U.S. healthcare system. Change offers a suite of software, analytics, technology-enabled services and network solutions with the goal of driving improved results in the complex workflows of healthcare system payers and providers.

24.     UnitedHealth is a diversified health care company, offering a diverse range of products and services through its two distinct business platforms: UnitedHealthcare, which provides health benefits, and Optum, which provides health services. Through UnitedHealthcare and Optum, in 2019, UnitedHealth Group processed nearly a trillion dollars in gross billed charges and UnitedHealth Group managed more than $250 billion in aggregate health care spending on behalf of the customers and consumers UnitedHealth Group serves.

25.     On January 6, 2021, Change authorized the issuance of a press release announcing the Proposed Merger, which states in relevant part:

**OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform**

EDEN PRAIRIE, Minn. & NASHVILLE, Tenn.--(BUSINESS WIRE)--Optum, a diversified health services company and part of UnitedHealth Group (NYSE: UNH), and Change Healthcare (NASDAQ: CHNG), a health care technology leader, have agreed to combine. Change Healthcare will join with OptumInsight to provide software and data analytics, technology-enabled services and research, advisory and revenue cycle management offerings to help make health care work better for everyone.

This combination unites two technology and service companies focused on serving health care. Their combined capabilities will more effectively connect and simplify core clinical, administrative and payment processes - resulting in better health outcomes and experiences for everyone, at lower cost. Change Healthcare brings key technologies, connections and advanced clinical decision, administrative and financial support capabilities, enabling better workflow and transactional connectivity across the health care system. Optum brings modern analytics, comprehensive clinical expertise, innovative technologies and extensive experience in improving operational and clinical performance.

"Together we will help streamline and inform the vital clinical, administrative and payment processes on which health care providers and payers depend to serve patients," said Andrew Witty, President of UnitedHealth Group and CEO of Optum. "We're thrilled to welcome Change Healthcare's highly skilled team to create a better future for health care."

"This opportunity is about advancing connectivity and accelerating innovations and efficiencies essential to a simpler, more intelligent and adaptive health system. We share with Optum a common mission and values and importantly, a sense of urgency to provide our customers and those they serve with the more robust capacities this union makes possible," said Neil de Crescenzo, President and CEO of Change Healthcare. Upon closing, Mr. de Crescenzo will serve as OptumInsight's chief executive officer, leading the combined organization.

Some of the key opportunities to enhance the health care system include:

- The combined company will help clinicians make the most informed and clinically advanced patient care decisions, more quickly and easily. Change Healthcare brings widely adopted technology for integrating evidence-based clinical criteria directly into the clinician's workflow, while Optum's clinical analytics expertise and Individual Health Record can strengthen the evidence base needed to deliver effective clinical decision support at the point of care. This can ensure appropriate sites of care and consistently achieve the best possible health, quality and cost outcomes.

- Complexities across the health system result in significant levels of administrative waste. The combined company will be well positioned to make health care simpler, more efficient and more effective. A key opportunity is to enhance with insights drawn from billions of claims transactions using Change Healthcare's intelligent health care network, combined with Optum's advanced data analytics. This will support significantly faster, more informed and accurate services and processing.

- Change Healthcare's payment capacities combined with Optum's highly automated payment network will simplify financial interactions among care providers, payers and consumers and accelerate the movement to a more modern, real-time and transparent payment system. This will ensure physicians get paid more quickly, accurately and reliably, and provide consumers the same simplicity and convenience managing their health care finances they experience with other transactions. Change Healthcare brings deep patient communication capabilities, engaging more than 200 million unique individuals each year. Integrating these engagements with people's health financial benefits will make it simpler for consumers and enhance alignment with incentive programs which reward healthy behaviors.

"Change Healthcare has made significant progress executing its strategic objectives, including advancing innovation, accelerating growth and improving the effectiveness of the U.S. health system," said Howard Lance, Chairman of the Board of Directors of Change Healthcare. "We are delighted to have in Optum a partner that shares a common vision of creating a better future for health care for the people and communities we serve and see this combination as in the best interests of all of our stakeholders."

The agreement calls for the acquisition of Change Healthcare's common stock for $25.75 per share in cash and is expected to close in the second half of 2021, subject to Change Healthcare shareholders' approval, regulatory approvals and other customary closing conditions. Private equity funds affiliated with The Blackstone Group, which own approximately 20% of the common stock of Change Healthcare, have agreed to vote the shares they control in favor of the combination.

The acquisition is expected to be accretive to UnitedHealth Group's net and adjusted earnings per share by approximately $0.20 and $0.50 respectively in 2022, advancing strongly in subsequent years, inclusive of investments to accelerate technology, system and product integration and development activities to more quickly deliver the value of this combination to all health care system stakeholders. Adjusted earnings exclude from net earnings only the after-tax non-cash amortization expense pertaining to acquisition-related intangible assets.

26.     The Proposed Merger comes in the midst of the COVID-19 pandemic

("Pandemic"), at a time when stocks throughout the world are subject to great uncertainty and

radical change. The Merger Consideration does not compensate stockholders for the intrinsic value of their shares. And so, piggybacking off the Pandemic, the Proposed Merger may provide a substantial discount to UnitedHealth, at the expense of the common stockholders who will not see the intrinsic value of their shares realized nor be able to partake in the continued growth of the Company. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for stockholders to properly determine how to vote their shares.

**B.      The Misleading Proxy Omits Material Information**

27.      On February 11, 2021, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents or omits material information concerning the companies' financial projections, the interests of the Individual defendants in the Proposed Merger, as well as Goldman Sachs' financial analyses. This information is necessary for Change's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

28.      *First*, the Proxy only contains one set of Change's financial projections, and defines the "Projections" as the following:

> The Projections for fiscal years 2021 through 2023 (the "LRP Projections") were prepared by management as part of the Board-approved LRP, independent of Change's evaluation of the proposed transaction with UnitedHealth Group. The Projections for fiscal years 2024 through 2030 are not part of the LRP but were prepared by management and approved by the Board as extrapolations of the LRP Projections for purposes of the valuation analyses conducted by Goldman Sachs.

Proxy at 56. However, the Proxy also refers to "Tax Attribute Projections" which were utilized by Goldman Sachs' in its *Illustrative Discounted Cash Flow Analysis*. Yet the Proxy omits these

financial projections from stockholders. Without the Tax Attribute Projections stockholders lack information relied upon by Goldman Sachs in its financial analyses, and that are reflective of managements' best currently available estimates regarding the Company's future and present value.

29.     If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, the omission of the Tax Attribute Projections renders the Proxy misleading incomplete and so this information must be disclosed.

30.     ***Second***, the Proxy describes Goldman Sachs' fairness opinion and valuation analyses performed in support of its opinion yet omits critical information. Defendants concede the materiality of this information in citing Goldman Sachs' fairness opinion and its valuation analyses among the reasons for recommending the merger to Change shareholders. However, the summaries of Goldman Sachs' fairness opinion and analyses provided in the Proxy fail to include key inputs and assumptions. Without this information, as described below, Change's shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on Goldman Sachs' fairness opinion in deciding whether to vote in favor of the Proposed Merger. The following omitted information, if disclosed, would significantly alter the total mix of information available to Change's shareholders.

31.     In summarizing Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* ("DCF"), the Proxy fails to disclose: (i) terminal value for the Company; (ii) the basis for applying a range of perpetual growth rates of 1.25% to 2.25%; (iii) the basis for applying the discount rate

range of 6.75% to 7.75%; and (iv) all other company specific inputs such as the Company's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and beta.

32.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Proxy fails to disclose: (i) the basis for limiting the range of years to 2021 to 2024; (ii) Change's Net Debt; (iii) the basis for utilizing the treasury stock method; (iv) the basis for selecting a discount rate of 7.5%; and (v) all other company specific inputs.

33.     With respect to Goldman Sachs' *Selected Companies Analysis*, Defendants must disclose the inputs of the individual companies and metrics observed by Goldman Sachs.

34.     With respect to Goldman Sachs' *Selected Precedent Transactions Analysis*, Defendants must disclose the metrics observed and the individual premiums paid for each of the transactions observed.

35.     These key inputs are material to Change shareholders, and their omission renders the summary of Goldman Sachs' fairness opinion incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles explaining the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions: in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult*

> *to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.* The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above, material information, Change shareholders cannot evaluate for themselves the reliability of Goldman Sachs' fairness opinion, make a meaningful determination of whether the implied equity value per share range reflects the true value of the Company or was the result of Goldman Sachs' unreasonable judgment, and make an informed decision regarding whether to vote in favor of the Proposed Merger.

36.    ***Third***, the Proxy fails to disclose information concerning the background of the merger. Specifically, it fails include details concerning whatever steps the Board took isolate itself from potential conflicts of interest. Indeed, Defendant Crescenzo will remain employed and become the Chief Executive Officer of the post-merger company. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

37.    In addition, the Proxy fails to adequately inform stockholders regarding the Board's failure to conduct a market check. According, to the Proxy Goldman Sachs merely contacted third parties without detailing what efforts were taken or how many parties were contacted. A reasonable shareholder would want to know the motivations of the Board in the sales process, as it could directly impact the fairness of the merger. Further disclosure is needed concerning Defendants'

market check and the Board's efforts to isolate conflicts of interest, so that stockholders may determine how much, if any, reliance to place on their recommendation of fairness when making an informed decision regarding a merger transaction.

38.     In sum, the omission and/or misstatement of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act and in breach of the duty of candor/disclosure. Absent disclosure of the foregoing material information prior to the expiration of the Proposed Merger, Plaintiff and other Change shareholders will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

39.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

41.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications shall not contain "any statement which, at the time and

in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

42.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

43.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by Goldman Sachs in support of its fairness opinion.

44.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

45.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Goldman Sachs reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Goldman Sachs, as well as its fairness opinion and the assumptions made

and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' analyses in connection with their receipt of the fairness opinion, question Goldman Sachs as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

47.     Change is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

48.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only

through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Change within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Change, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were

thus directly involved in preparing this document.

53.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

**(Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure)**

56.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

57.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.    By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder

action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

59.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public stockholders.

60.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights she or he possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

61.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Proposed Merger or taking any steps to consummate the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 18, 2021                    **MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*